1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**FOR THE DISTRICT OF ARIZONA**

8

Pedro Yimi Cardin Alvarez,

9

Petitioner,

No. CV 25-02943 PHX GMS (CDB)

10

v.

A Number 240 051 567

11

David Rivas, Warden of the San Luis
Detention Center, Gregory J. Archambeault,
San Diego Field Office Director,
Immigration and Customs Enforcement and
Removal Operations, Todd Lyons, Acting
Director of Immigration and Customs
Enforcement, Kristi Noem, Secretary of the
Department of Homeland Security, Pamela
Bondi, United States Attorney General,

**REPORT AND
RECOMMENDATION**

12
13
14
15
16

Respondents.

17
18

**TO THE HONORABLE G. MURRAY SNOW:**

19

Petitioner Pedro Yimi Cardin Alverez, who is represented by counsel, seeks relief

20

pursuant to 28 U.S.C. § 2241. Cardin Alverez is currently detained by the United States

21

Department of Homeland Security ("DHS"), Immigration and Customs Enforcement

22

("ICE") at the San Luis Regional Detention Center in San Luis, Arizona.

23

**I.    Background**

24

Cardin Alvarez is a native of Cuba, born on October 4, 1990. Cardin Alvarez

25

entered the United States on or about February 9, 2022. Respondents contend: "Petitioner

26

entered the United States without being admitted, inspected or paroled by an immigration

27

officer on an unknown date at an unknown location." (ECF No. 14 at 2). The record

28

supplied by Respondents indicates Cardin Alvarez "encountered" United States Border

Patrol agents on February 9, 2022, eleven miles northeast of the San Luis, Arizona, port of entry. (ECF No. 19-2 at 237). Cardin Alvarez was detained and transported to the Wellton Sector Border Patrol Station near Yuma, Arizona, for inspection and processing. (ECF No. 19-2 at 147, 238). *Inter alia*, Cardin Alvarez was fingerprinted and found to have no prior entry into, or criminal history in, the United States. (ECF No. 19-2 at 232-33, 237). The record states that, while at the border, Cardin Alvarez "claim[ed] fear of returning to their home country." (ECF No. 19-2 at 239). The Record of Deportable/Inadmissible Alien in the record, dated February 12, 2022, states: "Credible Fear Claim." (ECF No. 19-2 at 237).

At that time, the government chose to not pursue expedited removal.[1] Rather than being processed for expedited removal Cardin Alvarez was released from detention on February 12, 2022. Cardin Alvarez was issued an Order of Release on Recognizance, Form I-220A, a form of conditional parole. (ECF No. 19-2 at 147, 239). Cardin Alvarez was also issued a Notice to Appear ("NTA"), Form I-862, placing him in formal removal proceedings pursuant to Immigration and Nationality Act ("INA") § 240, codified at 8 U.S.C. § 1229a. The NTA required Cardin Alvarez to appear before an Immigration Judge ("IJ") officer on November 7, 2023, in Miami, Florida. (ECF No. 19-2 at 150, 214). The NTA stated Cardin Alvarez had been found inadmissible pursuant to section "212(a)(6)(A)(i) of the INA," as "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General." (ECF No. 19-2 at 150). When he was inspected and processed at the border Cardin Alvarez provided an address in Miami and he possessed an unexpired Cuban passport.[2]

---

[1] The Department of Homeland Security ("DHS") has the discretion to initiate either full removal proceedings under 8 U.S.C. §§ 1229 and 1229a, or expedited removal proceedings under 8 U.S.C. § 1225(b)(1), at the time of a person's inspection at the border in the United States. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011).

[2] Cardin Alvarez's father, who was born in Cuba, is a lawful permanent resident of the United States.

Cardin Alvarez attended all scheduled hearings with regard to his § 240 removal proceedings. Cardin did not commit any crimes or have any encounters with law enforcement after being released into the United States.

On June 28, 2022, within one year of being allowed to enter the United States, Cardin Alvarez submitted an I-589, Application for Asylum and for Withholding of Removal, to the United States Citizenship and Immigration Services ("USCIS"). (ECF No. 14 at 2; ECF No. 19-2 at 183-84). He was advised: "Your complete Form 1-589 Application for Asylum and Withholding of Removal was received and is pending as of 06/28/2022. *You may remain in the U.S. until your asylum application is decided*." (ECF No. 19-2 at 186) (emphasis added). Cardin Alvarez sought asylum based on his political opinion and the situation in Cuba. (ECF No. 19-2 at 192). The application states:

> … ME AND MY FAMILY HAVE EXPERIENCED MISTREATMENT AND HARM CAUSED DIRECLTY [sic] BY ACTIONS IMPLEMENTED BY THE CUBAN GOVERNMENT. THESE MISTREATMENTS OCURRED ONLY BECAUSE ME AND MY FAMILY OPENLY EXPRESSED OUR POLITICAL OPINION AGAINST THE CUBAN REGIME. POLICE BODIES AND GOVERNMENT BODIES KNOW OUR POSITION AGAINST THE COMMUNIST PARTY CURRENTLY IMPLEMENTED IN CUBA AND THEY MADE SURE WE WERE THREATENED TO THE POINT OF FEAR.
> I PERSONALLY FEAR HARM AND IMPRISOMENT BY THE CUBAN GOVERNMENT AND THE COMMUNIST PARTY. THIS WILL HAPPEN MAINLY BECAUSE OF MY OPEN POLITICAL OPINION AND LACK OF HUMAN RIGHTS AND FREEDOM OF SPEECH CURRENTLY IN CUBA.

(ECF No. 19-2 at 192-93) (all capitals in the original). Cardin Alvarez was found eligible for an interview regarding his request for asylum on June 30, 2022. (ECF No. 19-2 at 74).

On August 31, 2023, Cardin Alvarez submitted to the USCIS an I-485, Application to Register Permanent Residence or Adjust Status, pursuant to the Cuban Adjustment Act ("CAA"), Public Law 89-732, as a Cuban national present in the United

States for more than a year. (ECF No. 19-2 at 56-57, 76, 113, 273).[3] At that time Cardin Alvarez had received a work permit and a Social Security Number, and he had been employed since May of 2023. (*Id. See also* ECF No. 19-2 at 114-15). The application to adjust status noted Cardin Alvarez's date of entry as February 9, 2022, at the San Luis Port of Entry, where he had been processed after being apprehended shortly after crossing the border and detained. (ECF No. 19-2 at 77). The record indicated Cardin Alvarez was inspected at time of entry, and Cardin Alvarez presented his Cuban passport and birth certificate to establish his identity. (ECF No. 19-2 at 144-46).

An entry in Cardin Alvarez's immigrant records dated September 22, 2023, regarding "DOJ-EOIR removal case details," notes that Cardin Alvarez was scheduled for a master hearing on November 7, 2023. (ECF No. 19-2 at 263). The sole "charge" alleged against Cardin Alvarez at that time was that he was removable pursuant to INA § 212(a)(6)(A)(i) (8 U.S.C. § 1182(a)(6)(A)(i)), as a noncitizen present in the United States without being admitted or paroled, or one who arrived in the United States at any time or place other than designated by the Attorney General. (*Id.*).

A USCIS record dated September 25, 2023, states:

> This applicant, who was released by ICE with INA 236 paperwork (Order of Release on Recognizance, I-220A), is subject to expedited removal.[4] The record does not contain evidence of an admission or an INA 212(d)(5) parole [for urgent humanitarian reasons or significant benefit]. Please consult with local counsel before adjudicating.

---

[3] "Adjustment of status" is a process by which noncitizens who are physically present in the United States can apply for lawful permanent resident status without having to return to their home country to obtain an immigrant visa. Prior to 2023 Cuban nationals who entered the United States without prior approval and were released with a Form I-220A were deemed an applicant for admission who were subject to mandatory detention under § 235(b) of the Immigration and Nationality Act ("INA"). However, because DHS has no authority to release someone from mandatory detention unless it uses parole authority, release under Form I-220A (release on recognizance) implies the person was paroled as a matter of law, even if no formal parole document was issued. This is an important distinction because relief under the Cuban Adjustment Act requires the applicant be admitted or paroled into the United States.

[4] INA § 236, codified at 8 U.S.C. § 1226(a), provides that an immigrant in removal proceedings may be released on bond during their proceedings, and § 1226(c) requires detention of some classes of noncitizens, such as those who have committed crimes. In September of 2023 Cardin Alvarez was not in expedited removal proceedings nor had he been released on bond.

(ECF No. 19-2 at 253, 255).

On November 3, 2023, Cardin Alvarez filed a motion in the United States Department of Justice Executive Office for Immigration Review ("EOIR" or immigration court) to dismiss, presumably (the motion is not entirely clear), his immigration proceedings, which would have allowed him to proceed on his application to adjust his status before the USCIS, which he asserted would take less time. (ECF No. 19-2 at 273-80). That motion was denied by an IJ on November 9, 2023. The IJ found that Cardin Alvarez was "not eligible to adjust-status with USCIS." (ECF No. 19-2 at 283).

On November 6, 2023, in preparation for Cardin Alvarez's NTA hearing on November 7, 2023, the immigrant record noted Cardin Alvarez was Cuban, and there is a notation of a "PWI [provisional unlawful presence waiver]." (ECF No. 17-2 at 69). The file indicates "nothing in … [the file] to reflect CF [credible fear] review; DOE 2/9/22; PLAnet notes from earlier today reflect a motion was rec'd today … but it doesn't say want [sic] type of motion and its not in PLAnet docs or ECAS; no i589 in either as well." (*Id.*). The statement regarding a "waiver" presumably references Cardin Alvarez's release on recognizance and/or parole. The statement that Cardin Alvarez had not received a credible fear review, and that there was no I-589 in the record, is belied by the record. (ECF No. 19-2 at 237-39).

Cardin Alvarez's application for adjustment of status under the CAA was administratively closed by USCIS "based on the record" on March 23, 2024. (ECF No. 19-2 at 110, 155, 293). The letter advising of this dismissal states:

> USCIS reviewed your case file and determined that you are currently in proceedings before an Immigration Judge … It does not appear that the removal proceedings against you have been terminated. See 8 CFR 245.1(c)(8)(ii). USCIS also determined that you are not an "arriving alien." *Since you are a respondent in a removal proceeding, and you are <u>not</u> an "arriving alien*," only EOIR has jurisdiction to grant or deny your Form I-485 based on the merits. Because USCIS docs not have jurisdiction, your Form I-485 is administratively closed; however, *this does not prevent you from seeking adjustment before EOIR*. See 8 CFR 245.2(a)(I) and 1245.2(a)(l ).

*If the removal proceedings are terminated without a ruling by EOIR on your adjustment application, you may submit to this office a copy of the termination order and a written request for USCIS to reopen your form I-485.*

(ECF No. 19-2 at 155) (emphasis added).

On March 25, 2025, approximately one year after Cardin's application for adjustment of status was administratively closed, a memo forwarding his application for asylum to EOIR from the USCIS "Asylum Vetting Center" states:

A review of the applicant's file indicates that the applicant was issued a *Notice to Appear which was filed and docketed with EOIR on 01/18/2023.*

*The applicant's Form 1-589 had previously been received by USCIS on 06/28/2022.*

As the applicant's NTA was filed and docketed with EOIR *after* USCIS received Form 1-589, USCIS lacks jurisdiction over the applicant's *affirmative* asylum application and the *affirmative* case will be closed.

The applicant's 1-589 will be forwarded to EOIR for consideration as a *defensive application* ….

(ECF No. 19-2 at 199-200) (emphasis added).[5]

On January 23, 2025, Benjamin Huffman, the Acting Secretary of DHS, issued a memorandum to ICE, U.S. Customs and Border Protection ("CBP"), and USCIS. The memorandum directed officers to "take all steps necessary" to implement new policies regarding anyone "amenable to expedited removal but to whom expedited removal has not been applied." *Guidance Regarding How to Exercise Enforcement Discretion*, https://www.dhs.gov/publication/guidance-regarding-how-exercise-

---

[5] In general, an alien may apply for asylum in one of three ways: (1) if she is not in any kind of removal proceeding, she may file an affirmative application for asylum, *see* 8 U.S.C. § 1158(a)(1); 8 C.F.R. § 208.1(a)(1); (2) if she is subject to regular removal proceedings under 8 U.S.C. § 1229a, she may file a defensive application for asylum as a defense to removal, *see* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b); or (3) *if she is subject to expedited removal proceedings under 8 U.S.C. § 1225, she may also file a defensive application for asylum as a defense to expedited removal*, *see* 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f). *O.A. v. Trump*, 404 F. Supp. 3d 109, 121 (D.D.C. 2019) (emphasis added).

It is noted that Cardin Alvarez's first NTA was issued on February 12, 2022, prior to the date that he filed his I-589.

enforcement-discretion (last visited Oct. 6, 2025) ("*Huffman Memorandum*"). The "necessary steps" included "terminat[ing] any ongoing removal proceedings." *Id.* The memorandum instructs that henceforth DHS would take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," stating that "*the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner*." *Id.* (emphasis added). The memorandum provides, specifically:

> (1) For any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied:
>> a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal. This may include steps to terminate any ongoing removal proceeding and/or any active parole status.
>
> (2) For any alien DHS is aware of who does not meet the conditions described in (1) but has been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum:
>> a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether any such alien should be placed in removal proceedings; and
>> b. Review the alien's parole status to determine, in exercising your enforcement discretion, whether parole remains appropriate in light of any changed legal or factual circumstances.
>
> The actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders. They shall also be taken in a manner that takes account of legitimate reliance interests. It should be noted, however, that parole is a positive exercise of enforcement discretion to which no alien is entitled and that parole "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A). Further, *the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner*. *See* 8 U.S.C. § 1225(b)(l).

*Id.* (emphasis added).

On January 24, 2025, DHS published a notice in the Federal Register that expanded the application of expedited removal. *See* Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) ("Designating Aliens"). The notice provides:

The INA grants the Secretary of Homeland Security the "sole and unreviewable discretion" to modify at any time the discretionary limits on the scope of the expedited removal designation. The Secretary is exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not currently designated: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and *who have been continuously present in the United States for less than two years*; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and *who have been continuously present in the United States for at least 14 days but for less than two years*. Therefore, the designation in this Notice restores the scope of expedited removal to the fullest extent authorized by Congress ....

*Id.* (emphasis added).

On May 20, 2025, a directive from the Secretary of the Department of Homeland Security advised ICE officials to increase immigration arrests to 3,000 per day—triple the status quo. *See Coalition for Humane Immigrant Rts. v. Noem*, ___F. Supp. 3d ___, 2025 WL 2192986, at *12 n.14 (D.D.C. Aug. 1, 2025) ("*Coalition*"). Citing evidence presented in that case, the court concluded: "DHS sees and is using expedited removal as a basis to arrest and detain immigrants previously paroled from detention in section 240 removal proceedings." *Id.* ("... discussing the need to increase the incentives against illegal immigration through, inter alia, 'detention capabilities' and the problem of 'releases from [U.S. Border Patrol] custody'").

At Cardin Alvarez's EOIR hearing on May 27, 2025, the government's motion to dismiss the pending § 240 removal proceedings was granted and Cardin Alvarez's application for asylum and/or withholding of removal and his application for adjustment of status pursuant to the CAA were "dismissed" or "withdrawn." (ECF No. 19-2 at 56-57). At that time, because Cardin Alvarez had been in the United States for more than two years, with the United States' permission, Cardin Alvarez was not, per the applicable statute, eligible for expedited removal even under the new "guidance" and delegation of discretion to DHS. Moreover, he had a reliance interest in the adjudication of his application for asylum because the notice accepting his asylum application stated: "You

may remain in the U.S. until your asylum application is *decided*." (ECF No. 19-2 at 186) (emphasis added).

Nonetheless, at the conclusion of the hearing ERO issued a Notice and Order of Expedited Removal, signed by an "immigration officer, also identified as a "Deportation Officer," charging inadmissibility pursuant to § 212(a)(7)(A)(i)(I) of the INA, as an immigrant who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document, or a valid unexpired passport, or other suitable travel document, or document of identity and nationality. (ECF No. 19-1 at 86). This notice stated a basis for removal other than the original NTA, which found him to be "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General." (ECF No. 19-2 at 57). Additionally, Cardin Alvarez's file notes that, notwithstanding his defensive application for asylum, and the finding at the border that he had a "credible fear," he had "not claimed fear of return or expressed any related concerns." (ECF No. 19-2 at 57).[6] The order of removal was served on Cardin Alvarez on August 18, 2025, more than two months after his May 27, 2025, hearing, but he refused to sign. (ECF No. 19-1 at 86).[7]

To the extent that Cardin Alvarez's application for adjustment of status under the CAA was administratively closed but deemed open as a defense to removal, although an IJ had jurisdiction to adjudicate Cardin Alvarez's removal proceedings, the IJ did not have the jurisdiction to adjudicate the application for adjustment of status pursuant to the

---

[6] Arguably, dismissal of the § 240 proceedings terminated the pending application for asylum. However, in such circumstance Cardin Alvarez had the right to reinitiate his asylum proceedings a Form I-589 Filed After Removal Proceedings are Dismissed or Terminated https://www.uscis by affirmatively filing an I-589 with USCIS, which would then be treated as a continuation of the original application. *See* U.S. CITIZENSHIP & IMMIGRATION SERVS., How USCIS Processes a Form I-589 After Removal Proceedings are Dismissed or Terminated, https://www.uscis.gov/humanitarian/refugees-and-asylum/how-uscis-processes-a-form-i-589-filed-after-removal-proceedings-are-dismissed-or-terminated (last visited Oct. 3, 2025).

[7] Cardin Alvarez's counsel makes additional notable observations regarding the order of removal in their sur-reply to the petition at ECF No. 25.

1    CAA, which was the effect of the IJ "withdrawing" the I-485 application. Immigration

2    judges lack jurisdiction to consider adjustment of status, pursuant to the CAA, regarding

3    noncitizen Cuban nationals in removal proceedings. *See Perez v. United States Bureau of*

4    *Citizenship & Immigr.*, 774 F.3d 960, 968 (11th Cir. 2014); *Matter of Martinez-*

5    *Montalvo*, 24 I. & N. Dec. 778, 782–83 (BIA 2009). *See also* 8 C.F.R. §§ 245.2(a)(1) &

6    1245.2(a)(1)(ii).[8] Moreover, the Notice and Order of Expedited Removal issued May 27,

7    2025, citing INA § 235(b)(1), 8 U.S.C. § 1225(b)(1), states Cardin Alvarez had been

8    found

> … inadmissible under 212(a)(7)(A)(i)(I). You are an immigrant not in
> possession of a valid unexpired immigrant visa, reentry permit, border
> crossing card, or other valid entry document required by the Immigration
> and Nationality Act; and/or … an immigrant not in possession of a valid
> unexpired passport, or other suitable travel document, or document of
> identity and nationality.
>
> See I-831 [Application for Waiver of Grounds of Inadmissibility].[9]

(ECF No. 19-1 at 86).

---

[8] Immigration judges do not have jurisdiction to make final determinations on an application for adjustment of status under the CCA. This jurisdictional limitation derives from Attorney General's implementation of specific regulations in 1997. *See* Leslie Perez Perez, *Are Cubans Unjustly Favored Relative to Non-Cubans Immigrants?-an Understanding of the Communist Reality in Cuba and the Legitimacy of the Cuban Adjustment Act*, 22 ILSA J. Int'l & Comp. L. 563, 573 (2016). *See also In re Martinez-Montalvo*, 24 I. & N. Dec. 778, 782 (BIA 2009) ("[USCIS] generally has exclusive jurisdiction to adjudicate adjustment applications of arriving aliens. The only exception to this rule arises when an alien who leaves the United States while an adjustment application is pending with the USCIS returns pursuant to a grant of advance parole and is placed in removal proceedings."). The term "arriving alien" includes noncitizens paroled, but not admitted, into the United States, and inadmissible noncitizens charged with removal under § 1182. *See Perez v. United States Bureau of Citizenship & Immigr. Servs.*, 774 F.3d 960, 966 (11th Cir. 2014), *citing Dormescar v. United States Att'y Gen.*, 690 F.3d 1258, 1265 (11th Cir. 2012).

[9] Refugees and asylum seekers may be eligible for a waiver of inadmissibility under § 209(c) of the INA. This provision allows for waivers of grounds of inadmissibility for noncitizens seeking adjustment of status, including humanitarian reasons, national interest, or family unity. The waiver provisions apply to both asylees and refugees, and the Secretary of DHS or the Attorney General may waive any provision of the INA with respect to such an alien for these reasons.

After exiting the courtroom on May 27, 2025, Cardin Alvarez was arrested by ICE agents. Cardin Alvarez avers, and Respondents do not contradict, that ICE did not provide Cardin Alvarez with any process or access to counsel, and Cardin Alvarez was not afforded any opportunity to be heard prior to his arrest and detention.[10] Cardin Alvarez was taken to Krome North Service Processing Center in Miami, Florida.

On May 30, 2025, all Assistant Chief Immigration Judges received a email from two Regional Deputy Assistant Chief Immigration Judges, for the "guidance" of all IJs. *African Communities Together v.* Lyons, ___F. Supp. 3d___, 2025 WL 2633396, at *4 (S.D.N.Y. Sept. 12, 2025). The email advised that IJs had the authority to dispense with "written briefing on a motion to dismiss, dispense with a written decision and grant a motion to dismiss a removal proceeding" on any oral motion of DHS. *Id.*

On June 8, 2025, Cardin Alvarez was transferred to San Luis Regional Detention Center located in San Luis, Arizona, where Respondents assert he "is being processed under expedited removal proceedings." (ECF No. 14 at 3).

On June 26, 2025, Cardin Alvarez requested a custody redetermination hearing pursuant to 8 C.F.R. § 1236. (ECF No. 19-1 at 25). On July 2, 2025, an IJ denied the request for a redetermination. The IJ concluded that they lacked "jurisdiction as Respondent is not currently in 240 removal proceedings," citing *Matter of A-W-*, 25 I&N Dec. 45, 46 (BIA 2009). (ECF No. 19-1 at 25).[11] Respondents contend the IJ found a lack of jurisdiction because Cardin Alvarez was an applicant for admission detained under

---

[10] The record states: "On May 27, 2025, the ICE ERO Miami Alternative to Detentions Unit (ATD) encountered [Cardin Alvarez], pursuant to an ERO Miami targeted operations in collaboration with OPLA Miami at [the EOIR court]." (ECF No. 19-2 at 56).

[11] *Matter of A-W-*, 25 I. & N. Dec. 45, 47 (BIA 2009), considered custody with respect to noncitizens under the Visa Waiver Program ("VSP"), and it is not clearly applicable to Cardin Alvarez's situation. In *Matter of A-W-* the BIA held that a noncitizen admitted to the United States pursuant to the VWP, who had not been served with a NTA, was not entitled to a custody hearing before an IJ. *Id.* at 48. Historically, Cuban nationals have not been included in the VWP. Instead, Cuban immigrants have been subject to distinct immigration policies, such as the Cuban Adjustment Act ("CAA"), which provides a pathway to legal permanent residency for certain Cuban nationals who are physically present in the United States. The VWP is a separate program with its own eligibility criteria and does not appear to intersect with policies specific to Cuban immigrants.

INA § 235, 8 U.S.C. § 1225, and therefore subject to mandatory detention under INA § 235(b), 8 U.S.C. § 1225(b).

Respondents assert:

> On or about June 27, 2025, ERO started the process of preparing a travel document request for Petitioner *Id.* at ¶ 21. On July 8, 2025, ERO interviewed the Petitioner to inquire whether he wished to be removed to Mexico. He declined removal to Mexico. *Id.* at ¶ 22.
> On July 14, 2025, ERO began working on requesting travel documents to facilitate the Petitioner's removal to Cuba. *Id.* at ¶ 23. On July 14, 2025, ERO served the Form I-229(a) Warning for Failure to Depart along with an instruction sheet for Petitioner to assist in their removal. …
> On August 10, 2025, ERO worked on assembling a travel documentation request for the Petitioner to be removed to Cuba. *Id.* at ¶ 25.
> On August 21, 2025, ERO submitted a travel document request packet to the Detention and Deportation Officer (ODO) assigned to Cuban cases at ERO Headquarters, Removal and International Operations (RIO) for review. *Id.* at ¶ 26
> On September 15, 2025, ERO inquired with RIO [Removal and International Operations] as to the status of Petitioner's travel documents and learned that no response had yet been received. *Id.* at ¶ 27.

(ECF No. 14 at 3-4). Respondents also assert: "To date [September 16, 2025], Petitioner has made no request for a credible fear interview." (ECF No. 14 at 4).[12]

---

[12] Respondents assert:
Section 1225(b)(1) applies to arriving aliens and "certain other" aliens "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid document." *Id.*; 8 U.S.C. § 1225(b)(1)(A)(i), (iii). These aliens are generally subject to expedited removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(A)(i). But if the alien "indicates a intention to apply for asylum … or a fear of persecution," immigration officers will refer the alien for a credible fear interview. *Id.* § 1225(b)(1)(A)(ii). This Section is inapplicable. Though [Cardin Alvarez] *claims* that he submitted an I-589 Application for Ayslum, Withholding of Removal and Convention against Torture with the USCIS (Pet., Doc. 1, ¶ 24), Petitioner has not requested a credible fear interview. Ex. A, Valenzuela Dec. at ¶ 20. He must be detained until removed from the United States. *Id.* §§ 1225(b)(1)(A)(i), (B)(iii)(IV).
(ECF No. 14 at 8) (emphasis added). Respondents' use of the term "claims" is an erroneous misrepresentation of the record. Cardin Alvarez's I-589 application, his application for asylum which prompts a credible fear interview, is in the record supplied by Respondents. Elsewhere in their response to the petition Respondents do not equivocate when stating Cardin filed an application for asylum and/or withholding of removal. (ECF No. 14 at 2). Moreover, there is an

II.    **Claims for relief**

Cardin Alvarez asserts he was denied his right to procedural due process in his removal proceedings. Cardin Alvarez also asserts a violation of his right to substantive due process, i.e., that he was deprived of his liberty without due process of law.

III.    **Relief Pursuant to § 2241**

The Court may issue a writ of habeas corpus pursuant to § 2241 if the petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." The essence of habeas corpus is an attack by a person in custody upon the legality of that custody. *E.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("the traditional function of the writ is to secure release from illegal custody.").

Cardin Alvarez avers his custody is in violation of his federal constitutional rights to due process of law. Cardin Alvarez contends Respondents violated the statutory framework governing his detention, removal proceedings, and the adjudication of his claims for relief from removal. Respondents contend the Court is without jurisdiction over the petition. (ECF No. 14 at 1).

The Court has jurisdiction to review whether Respondents' actions comply with the Constitution and the laws of the United States. *See, e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 485-87 (1973); *Ibarra-Perez v. United States*, ___ F.4th ___, 2025 WL 2461663, at *6 (9th Cir. Aug. 27, 2025); *You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018). The Ninth Circuit Court of Appeals has clearly held that jurisdiction over a habeas petition is not barred simply because the challenged actions "are in some fashion connected to removal orders." *Ibarra-Perez*, 2025 WL 2461663, at *7. The Court may entertain challenges to the procedural process that the executive branch follows during the removal process. *E.g.*, *Reno v. American–Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999); *Hernandez v. Session*, 872 F.3d 976, 986 (9th Cir. 2017); *You, Xiu Qing*, 321 F. Supp. 3d at 455-58 (finding the court had

indication that when inspected at the border in 2022 Cardin Alvarez expressed a credible fear of being removed to Cuba and was, accordingly, paroled on recognizance rather subjected to expedited removal.

jurisdiction to decide whether ICE's decision to remove a Chinese national before his motion to reopen was adjudicated would violate the INA). *See also Calderon v. Sessions*, 330 F. Supp. 3d 944, 956 (S.D.N.Y. 2018) (finding jurisdiction over a habeas petitioner's claim regarding a "legitimate and authorized pursuit of an existing process" before the government exercised its right to remove the petitioner from the United States); *J.R. v. Bostock*, ___F. Supp. 3d.___, 2025 WL 1810210, at *3 (W.D. Wash. June 30, 2025); *Fatty v. Nielsen*, No. 17-cv-1535, 2018 WL 3491278, at *1-2 (W.D. Wash. July 20, 2018) (holding § 1252(g) did not deprive the court of jurisdiction over the petitioner's request for a stay of his removal pending the adjudication of his petition for a visa).

Civil immigration detention is legal only when the underlying procedure it is in aid of is legal; otherwise, civil detention is unconstitutionally punitive. At its core, the legality and constitutionality of immigration detention is inextricably intertwined with the legality of the underlying immigration process resulting in the detention. If this were not true a noncitizen would be deprived of the "uncontroversial" "privilege of habeas corpus," which entitles an individual detained by the government a "meaningful opportunity" to demonstrate that they are "being held pursuant to the erroneous application or interpretation of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 799 (2008) (internal quotations omitted). *See also INS v. St. Cyr*, 533 U.S. 289, 302 (2001); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) ("*Accardi*"); *Ex parte Endo*, 323 U.S. 283, 285, 297, 302-04 (1944) (holding, *inter alia*, that when the government lacks authority to subject an individual to a legal process any attendant detention is also illegal). In *Boumediene*, the Supreme Court held the Suspension Clause "ensures that, except in period of formal suspension [of the writ of habeas corpus], the Judiciary will have a time-tested device, the writ, to maintain the delicate balance of governance that is itself the surest safeguard of liberty." 553 U.S. at 745 (internal citations and quotations omitted).[13]

---

[13] The Suspension Clause is found in Article I, Section 9, Clause 2 of the United States Constitution: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

As in *Boumediene*, the jurisdictional bar to habeas review invoked by Respondents would be tantamount to a suspension of the writ of habeas corpus with regard to Cardin Alvarez, and that bar cannot stand. Federal courts are to confront any ambiguity between the announcement of general rules and their application in specific cases. Rules are created in advance of an event, while cases are decided afterward with regard to the specific application of a rule to the unique circumstances presented in each case. Whether or not Respondents have violated the laws and Constitution of the United States in the process of detaining Cardin Alvarez is a question falling squarely within this court's habeas jurisdiction and, accordingly, the Court has jurisdiction over the § 2241 petition. *See Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011), *citing Demore v. Kim*, 538 U.S. 510, 516-17 (2003). *See also Lopez Reyes v. Bonnar*, 362 F. Supp. 3d 762, 772 (N.D. Cal. 2019).

## IV.    Governing Immigration Statutes and Regulations

When an immigrant is inspected at the United States border, either after arriving at the border or being apprehended within the country, and the immigrant is found to be without documentation such as a visa, and the immigrant is without a criminal history and has not been previously ordered removed from the United States, the immigrant may be placed in expedited removal proceedings or, if the immigration indicates either an intention to apply for asylum or expresses a "credible fear" of being removed, DHS can forgo the expedited removal process and place the immigrant in removal proceedings under § 240 of the INA (codified at 8 U.S.C. § 1229a), by issuing the immigrant a NTA. Although eligibility for asylum ultimately requires a well-founded fear of persecution arising from, *inter alia*, race or political opinion, all that a noncitizen must show to avoid expedited removal is a :credible fear." 8 U.S.C. §§ 1101(a)(42)(A) & 1158(b)(1)(A).[14] If the immigration officer finds an applicant's asserted fear to be credible, the noncitizen

---

[14] To be awarded asylum, an applicant must show that there is at least a ten-percent chance that they will be persecuted based on one of the five protected grounds, e.g., race, religion, nationality, membership in a particular social group, or political opinion. *See, e.g.*, *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 212 (D.D.C. 2020), *citing INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987).

will receive "full consideration" of their asylum claim in a standard removal hearing, i.e., in immigration proceedings pursuant to § 240 of the INA. *See* 8 C.F.R. § 208.30(f).

An immigrant must be allowed a "credible fear" screening to identify any potential eligibility for asylum before being ordered removed from the United States via expedited removal proceedings. *See Coalition*, 2025 WL 2192986, at *1; *Las Americas Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.*, 783 F. Supp. 3d 200, 229 (D.D.C. 2025). If a noncitizen establishes a credible fear of persecution after being placed in expedited removal proceedings they must be transferred from expedited removal proceedings to § 240 proceedings wherein their claim for asylum is litigated on the merits. *See* 8 C.F.R. §§ 235.3(b)(4) & 208.30. Emphasis must be placed on the fact that when a noncitizen in expedited removal proceedings "'indicates either an intention to apply for asylum ... or a fear of persecution," the United States "*shall*," i.e., *must*, refer that person for a credible fear interview. 8 U.S.C. § 1225(b)(1)(A)(ii)) (emphasis added). *See also Hasan v. Crawford*, ___ F. Supp. 3d ___, No. 25-cv-1408, 2025 WL 2682255, at *5 (E.D. Va. Sept. 19, 2025).

Additionally, noncitizens who have been admitted or paroled into the United States can seek withholding of removal, pursuant to an application for asylum, or they may apply for "adjustment of status," i.e., lawful permanent resident status, *inter alia* pursuant to the Cuban Adjustment Act.[15] Noncitizens may pursue some forms of adjustment of status in § 240 proceedings, but most means of adjustment of status can be obtained only through separate applications to USCIS. *See Coalition*, 2025 WL 2192986, at *9. Noncitizens in § 240 proceedings typically have time to pursue collateral relief, such as asylum or adjustment of status, before a final adjudication of their removal, through USCIS rather than the immigration court (the "EOIR"). However, in expedited removal proceedings these forms of relief are not available unless the noncitizen manages to establish a "credible fear" of removal, at which time they must be transferred back to

---

[15] The CAA provides that Cuban natives who were inspected and admitted or paroled at a United States port of entry and have been physically present in the United States for at least one year may apply to adjust their status to that of a lawful permanent resident. *See* 8 U.S.C. § 1255.

1  § 240 proceedings where a claim of asylum or an application to adjust status provides an

2  avenue of relief from removal. *Id.*

3          After inspection at the border an immigrant may also be allowed into the United

4  States via "parole." A noncitizen detained at the border may be formally paroled into the

5  United States only "for urgent humanitarian reasons or significant public benefit."

6  8 U.S.C. § 1182(d)(5)(A). *See also Biden v. Texas*, 597 U.S. 785, 806 (2022) (explaining

7  DHS's authority to parole applicants for admission is "not unbounded" because "DHS

8  may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent

9  humanitarian reasons or significant public benefit,'" *quoting* 8 U.S.C. § 1182(d)(5)(A)).

10  An immigrant may also be released from detention at the border and paroled into the

11  United States on recognizance, pending the finality of their removal proceedings and the

12  adjudication of any request for asylum or adjustment of status. "Release on recognizance

13  is not a humanitarian or public benefit parole into the United States under section

14  1182(d)(5)(A) but rather a form of conditional parole from detention upon a charge of

15  removability, authorized under section 1226." *Martinez v. Hyde*, ___F. Supp. 3d___,

16  2025 WL 2084238, at *3 (D. Mass. July 24, 2025) (internal quotations omitted). *See also*

17  *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115-16 (9th Cir. 2007) (distinguishing

18  between being paroled into the United States under § 1182(d)(5)(A) and being released

19  on recognizance under § 1226(a)); *Cruz-Miguel v. Holder*, 650 F.3d 189, 191 (2d Cir.

20  2011). The distinction between being paroled on recognizance and paroled pursuant to

21  § 1182(d)(5)(A) reflects more than an immigration officer's choice of paperwork.

22  Release on recognizance pursuant to § 1226(a)(2)(B) is "'legally distinct'" from parole

23  into the United States pursuant to § 1182(d)(5)(A). *Hasan*, 2025 WL 2682255, at *8,

24  *quoting Matter of Cabrera-Fernandez*, 28 I&N Dec. 747, 749 (BIA 2023). Parole into the

25  United States under § 1182(d)(5)(A) allows a noncitizen to physically enter the country,

26  subject to a reservation of rights by the government, whereas release on recognizance

27  releases a noncitizen already in the country from domestic detention. *Ortega-Cervantes*,

28

501 F.3d at 1115-16; *Martinez*, 2025 WL 2084238, at *3. This distinction is significant because it reflects different legal statuses and protections for noncitizens.

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress established two main processes for removing noncitizens deemed ineligible to enter or remain in the United States. *See* Pub. L. 104-208, 110 Stat. 3009, (1996). The first, commonly referred to as "section 240" proceedings due to the section of the IIRIRA in which it appears, is the standard mechanism for removing inadmissible noncitizens. Section 240 removal proceedings take place before an IJ, an employee of the Department of Justice, who must be a licensed attorney and who has a duty to develop the record in cases before them. *See* 8 U.S.C. §§ 1229a(a)(1) & 1229a(b)(1); 8 C.F.R. § 1003.10(a). Section 240 proceedings typically take place over the course of multiple hearings. *See Coalition*, 2025 WL 2192986, at *3. This allows time for individuals to gather and present evidence in support of petitions for withholding of removal, such as asylum, and to seek other forms of collateral relief from removal, such as adjustment of status. *See* 8 U.S.C. §§ 1229a & 1229b. After an IJ renders a decision in a § 240 proceeding, i.e., the IJ orders an immigrant removed or withholds removal based on an application for asylum or adjustment of status, either party may appeal to the Board of Immigration Appeals ("BIA"). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the noncitizen can appeal that decision to a federal court of appeals. *See* 8 U.S.C. § 1252.

When passing the IIRIRA Congress referred to the new § 240 as a "streamline[d]" removal process, relative to the prior process, because it removed a layer of appellate review. H.R. Rep. 104-469(I), 12, 107-08 (1996). Additionally, the IIRIRA included a more streamlined form of removal proceeding applicable only to certain noncitizens, i.e., "expedited removal." In contrast to § 240 removal, "[e]xpedited removal lives up to its name." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020) ("*Wolf*"). In expedited removal, an immigration officer, not an IJ, conducts the initial fact-finding. 8 C.F.R. § 235.3(b)(2)(i). The immigration officer asks a short series of questions to

determine the individual's "identity, alienage, and inadmissibility," and whether they intend to apply for asylum, fear of persecution or torture, or fear of returning to their country of origin. *Id.* §§ 235.3(b)(2)(i) & (b)(4). If the noncitizen is inadmissible and does not indicate a fear of persecution, or they do not state an intention to apply for asylum, the inspecting officer issues a notice and order of expedited removal and the noncitizen may respond in a sworn statement. 8 C.F.R. § 235.3(b)(2)(i). Under the expedited removal process, an immigration officer—not a neutral judge—may order removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). *See also Make the Road N.Y. v. Noem*, No. 25-cv-190, 2025 WL 2494908, at *7 (D.D.C. Aug. 29, 2025) ("*Make the Road*") ("Key to the speed of expedited removal is the lack of almost any judicial review."). After a supervising officer reviews and signs off on the immigration officer's determination, the noncitizen is ordered removed. *See Make the Road*, 2025 WL 2494908, at *3. The noncitizen has no right to appeal that decision to an IJ, the BIA, or (with one exception) any court. *See id.* And because noncitizens are usually detained during expedited removal proceedings, often far from their families or any legal counsel, they face significant barriers in gathering materials that they might use as evidence in these proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii).

The relevant federal statutes and regulations provide noncitizens may be eligible for expedited removal if they are: (1) noncitizens "arriving in the United States," i.e., appearing at the border; or (2) noncitizens who have "not been admitted or paroled into the United States" and they cannot affirmatively show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(i)–(iii). The relevant statute permits the Attorney General (or by delegation the Secretary of DHS) to designate the population of noncitizens who will be subject to expedited removal under the second category. *Id.* § 1225(b)(1)(A)(iii)(I). Initially, DHS's predecessor agency did not make any designation, thereby limiting expedited removal only to "arriving aliens," i.e., those who were turned away at the border. *See* Inspection and Expedited Removal of

Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312-01, 10313 (Mar. 6, 1997). When declining to make any designation under the second category DHS's predecessor agency "acknowledge[d] that application of the expedited removal provisions to aliens *already in the United States*" would "involve more complex determinations of fact" and "be more difficult to manage." *Id.* (emphasis added). Subsequent to 1997, however, DHS has made such designations. One DHS decision extended expedited removal to noncitizens apprehended within 100 air miles of any United States international land border who entered the county within 14 days of being apprehended. "And that was the state of play" in January of 2025, with the only people eligible for expedited removal being "arriving aliens," i.e., those who arrived by sea within the two years of being placed in expedited removal proceedings, and those apprehended within 100 miles of the border less than 14 days prior to being placed in expedited removal proceedings. *Make the Rd.*, 2025 WL 2494908, at \*4.

As noted *supra*, on January 23, 2025, the Acting DHS Secretary Huffman issued a memorandum to ICE, CBP, and USCIS, instructing officers to "take all steps necessary to review" the cases of anyone "amendable to expedited removal but to whom expedited removal has not been applied." *Huffman Memorandum*. The "necessary steps" specified in the guidance include "terminat[ing] any ongoing removal proceedings." *Id.* Also as noted *supra*, on January 24, 2025, DHS published a notice in the Federal Register that expanded the application of expedited removal. *See* Designating Aliens. The notice provide an expansion of the category of noncitizens who could be placed into expedited removal, to include ""aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States *for at least 14 days but for less than two years*." *Id.* (emphasis added). This is a significant change because, other than during a brief time in 2019, expedited removal had always been limited to noncitizens arriving by sea or those found within 100 miles of the border who had been in the country for less than 14 days. *See Coalition*, 2025 WL 2192986, at \*6 & n.9; *Make the Rd.*, 2025 WL 2494908, at \*4-5.

1   However, the designation clearly does not authorize the expedited removal of noncitizens

2   who have been in the United States for two years or more.

3       During the first few months after the January 2025 designation the government

4   was slow to implement the new guidance. However, in May of 2025 enforcement efforts

5   were significantly escalated. *See*, *e.g.*, *Make the Rd.*, 2025 WL 2494908, at *5. In May of

6   2025 the government set a goal of making 3,000 immigration arrests each day. *E.g.*, *id.*

7   "Apparently in an effort to meet that goal, the Government began targeting for expedited

8   removal people already in [§] 240 removal proceedings, many of whom are pursuing

9   asylum and other collateral relief." *Id.*

> These arrests follow a common pattern, with DHS first moving orally
> (without any advance notice) to dismiss the individual's pending
> section 240 proceedings, then arresting the individual at the courthouse
> immediately upon the dismissal of their section 240 proceedings, and then,
> finally, placing the individual in expedited removal proceedings through
> which they can be deported far more quickly, and with far less process,
> than they would have been in the section 240 proceedings. Using this
> method, the Government has deported people within days of dismissing
> their section 240 proceedings

16  *Id.* The purpose and effect of this method is to rapidly deport the noncitizens before they

17  can present their asylum claims. *Id.* at *11–12 (summarizing incidents of courthouse

18  arrests conducted by ICE nationwide).

19      On August 1, 2025, the United States District Court for the District of Columbia

20  stayed DHS's 2025 designation expanding expedited removal with regard to those

21  "individuals who have been, at any time, paroled into the United States at a point of

22  entry." *Coalition*, 2025 WL 2192986, at *39. The District of Columbia District Court

23  held the plaintiffs in that matter, brought pursuant to the Administrative Procedures Act,

24  were "substantially likely to prevail on [their] claim that the current procedures

25  [regarding expedited removal] do not satisfy the minimal requirements of due process."

26  *Id.* The District of Columbia District Court denied a stay of its order pending appeal and

27  on September 12, 2025, the District of Columbia Circuit Court of Appeals denied a stay

28  pending appeal. Although the specifics of the case involved the Cuban, Haitian,

Nicaraguan, and Venezuelan Parole Programs, the stay included all noncitizens who have been paroled into the United States; notably, one of the lead plaintiffs in *Coalition*, a class action, is similarly situated to Cardin Alvarez.[16]

> In *Coalition*, the District of Columbia District Court determined that under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), a person who has been paroled without first having been placed in expedited removal <u>cannot be designated for expedited removal</u>. … *Coalition* concluded that the statute "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22. *Coalition* at *22-*27 conducts an exhaustive analysis of § 1225(b)(1)(A)(iii), § 235.3(b)(1), relevant directives, and case authority to reach its holding. *Coalition* holds that § 1225(b)(1)(A)(iii) "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22.

*Espinoza v. Kaiser*, No. 25-cv-01101, 2025 WL 2675785, at *5 (E.D. Cal. Sept. 18, 2025) (emphasis in original). *See also Munoz Materano v.* Arteta, No. 25-cv-6137, 2025 WL 2630826, at *11 (S.D.N.Y. Sept. 12, 2025) (adopting the holding in *Coalition*).

And on August 29, 2025, the United States District Court for the District of Columbia concluded that the Huffman Memorandum and the designation published in the Federal Register created an intolerable risk of error in "determining whether a noncitizen has been present for two years," due to the government's "woefully inadequate

---

[16] M.A.R., a Cuban national, arrived at the San Ysidro port of entry in San Diego, California, on March 14, 2024. [] Although he entered with travel authorization, he hoped to stay in the United States because he faced threats, harassment, and retaliation from Cuban authorities for his vocal opposition to the Cuban Government. []. Upon inspection at the border, he was paroled into the United States (i.e., released into the country pending removal proceedings) and issued a Notice to Appear (NTA) in immigration court. []. Since arriving, he has obtained work authorization and a job, married a United States citizen, met all his legal obligations, and committed no crimes. []. He also filed an application for adjustment of status under the Cuban Adjustment Act (CAA), which has long permitted Cuban nationals who were admitted or paroled into the United States to become lawful permanent residents after being here for more than a year. *See* Cuban Adjustment Act of 1966 ("CAA"), 89 Pub. L. 732, 80 Stat. 1161; 8 U.S.C. § 1255 note [].
*Coalition for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *1 (D.D.C. Aug. 1, 2025) (internal citations to the record omitted).

procedures" for making that determination; for referring noncitizens who fear removal to the required credible fear screening interviews; and for ensuring that noncitizens with credible fears of persecution or torture are placed in or returned to full removal proceedings. *Make the Rd.*, 2025 WL 2494908, at *13-17. Accordingly, the District of Columbia federal court stayed actions pursuant to "[t]he Challenged Actions (the January 21 Designation Notice and the January 23 Huffman Memorandum insofar as it implements the January 21 Designation Notice)," pending conclusion of the court's review of the claims brought by the *Make the Road* plaintiffs. *Id.* at *23. The District of Columbia Circuit Court of Appeals is considering a motion for a stay of the District Court's *Make the Road* order pending appeal; oral argument was scheduled for October 6, 2025.

## V.    Analysis of Cardin Alvarez's Due Process Claims

In *A.A.R.P. v. Trump*, issued May 16, 2025, the United States Supreme Court stated: "The Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings." 145 S. Ct. 1364, 1367 (2005), *quoting Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025), *quoting Reno v. Flores*, 507 U.S. 292, 306 (1993), *citing Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903). In *A.A.R.P.* the Supreme Court reaffirmed that "'no person shall be removed from the United States without opportunity, at some time, to be heard." 145 S. Ct. at 1367 (internal quotations omitted). Moreover, the Supreme Court also held that summary removal from the United States without any meaningful opportunity to contest that removal "surely does not pass muster" under the Due Process Clause. *Id.* at 1368. Whether an individual within the United States has been denied their Constitutional right to due process is a decision ultimately reserved to the judicial branch of the United States government. *Cf. Boumediene*, 553 U.S. at 765 (rejecting the notion that "the political branches have the power to switch the Constitution on or off at will"). Additionally, the United States Supreme Court has squarely held that noncitizens seeking asylum in the United States are guaranteed procedural due process under the Fifth Amendment to the United States Constitution.

1  See, e.g., Reno, 507 U.S. at 306 ("It is well established that the Fifth Amendment entitles

2  aliens to due process of law in deportation proceedings.").

3  ### A.    Procedural Due Process

4        Cardin Alvarez asserts the issuance of the order of expedited removal, which

5  occurred without meaningful notice or an opportunity to be heard and resulted in his

6  mandatory detention, violated his right to procedural due process. Cardin Alvarez notes

7  that he "was previously released after his entry into the United States and complied fully

8  with all reporting and court appearance obligations during the pendency of his § 240

9  removal proceedings," and that he "affirmatively sought immigration relief in the form of

10  asylum, withholding of removal, and CAT protection." (ECF No. 1 at 7). Cardin Alvarez

11  argues that his detention "absent any operative legal process," is "constitutionally

12  insufficient to justify depriving him of his liberty without adequate procedural

13  protections." Id.

14        The Due Process Clause of the United States Constitution prohibits a deprivation

15  of an individual's liberty without due process of law. U.S. Const. amend. V. It is firmly

16  established that this protection extends to noncitizens present in the United States. E.g.,

17  Trump, 145 S. Ct. at 1006; Zadvydas v. Davis, 533 U.S. 678, 693, (2001) ("[T]he Due

18  Process Clause applies to all 'persons' within the United States, including aliens, whether

19  their presence here is lawful, unlawful, temporary, or permanent."); Wong Wing v. United

20  States, 163 U.S. 228, 238 (1896); Hussain v. Rosen, 985 F.3d 634, 642 (9th Cir. 2021).

21  "Freedom from imprisonment—from government custody, detention, or other forms of

22  physical restraint—lies at the heart of the liberty [the Due Process Clause] protects."

23  Zadvydas, 533 U.S. at 690.

24        "[I] is well-established that the Due Process Clause stands as a significant

25  constraint on the manner in which the political branches may exercise their plenary

26  authority" over which noncitizens may be allowed to remain in the United States, or who

27  may be detained in the United States. Hernandez, 872 F.3d at 990 n.17, citing Zadvydas,

28  533 U.S. at 695. The Due Process Clause protects Cardin Alvarez, a person within the

United States, from unlawful detention resulting from the denial of adequate procedural protections. *See Zadvydas*, 533 U.S. at 693, *cited in Hernandez v. Wofford*, No. 25-CV-00986, 2025 WL 2420390, at *3 (E.D. Cal. Aug. 21, 2025). Even those who face significant constraints on their liberty or those over whose liberty the government wields significant discretion retain a protected interest in their liberty. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019), *citing Young v. Harper*, 520 U.S. 143, 150 (1997). And the "essence" of procedural due process is that a person who is at risk of losing their liberty be given notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *E.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

> Were it true that "arriving" noncitizens have no due process rights, it would mean that such individuals—including those living freely among us on parole—could "be subjected to the punishment of hard labor without a judicial trial." *Clerveaux*, 397 F. Supp. 3d at 316 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 704 (2001) (Scalia, J., dissenting)). And it would mean that a noncitizen living here on parole could be taken into custody and beaten by local police without any violation of the Fourth Amendment. That cannot be the law.

*Mata Velasquez v. Kurzdorfer*, ___F. Supp. 3d.___, 2025 WL 1953796, at *16 (W.D.N.Y. July 16, 2025).

At the outset, it is noted that Respondents infer Cardin Alvarez had an obligation to "request" a "credible fear" interview at some point in his removal proceedings, but failed to do so. This is factually incorrect; Cardin Alvarez expressed a credible fear at the border in 2022, at which time he was not placed in expedited removal proceedings and was paroled into the United States, and he also expressed such fear by filing an application for asylum in 2023, which was pending when he was subjected to an order of expedited removal. Additionally, pursuant to United States statutes and regulations as cited *supra*, the burden is on the government to inquire as to a noncitizen's potential credible fear both at the border and prior to subjecting the noncitizen to an order of expedited removal. Prima facie eligibility for asylum relief is met when a noncitizen demonstrates they are is unwilling or unable to return to his country of origin "because of

persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *Ramirez-Munoz v. Lynch*, 816 F.3d 1226, 1228 (9th Cir. 2016), and the record in this matter indicates Cardin Alvarez credibly expressed such a fear.

A noncitizen such as Cardin Alvarez who is paroled on recognizance into the United States at the border, rather than being removed under the expedited removal protocol, who has subsequently filed an application for asylum, does not need to then specifically request a credible fear interview before being subjected to an order of expedited removal immediately after their § 240 proceedings are terminated and their application for asylum is simultaneously "withdrawn." The credible fear interview process is a separate procedural step that must be initiated by immigration authorities when an individual expresses a fear of persecution or harm if returned to their native country; the relevant statutes use the mandatory terms "shall" and "must" when describing the government's obligation to conduct a credible fear inquiry. Filing an asylum application inherently communicates such a fear, and the asylum process itself addresses the applicant's claims of credible fear. The general principles of asylum law and credible fear determinations under the INA suggest the credible fear interview is a preliminary screening mechanism for individuals who have *not yet formally applied for asylum*. Regardless, once an asylum application is filed, the supportability of the applicant's claims are evaluated through the asylum adjudication process, which includes an assessment of their fear of persecution or harm via the opportunity the applicant is provided to present evidence regarding their entitlement to this relief. Cardin Alvarez was not provided this opportunity; instead, his asylum proceedings were "withdrawn" without any opportunity for him to present any evidence in support of his application or any opportunity to appeal a negative finding.

"[U]nder deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Federal Def. of New York, Inc. v. Federal Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir.

2020), *cited in Ratsantiboon v. Noem*, No. 25-cv-01315, 2025 WL 1118645, at *2 (D. Minn. Apr. 15, 2025). *See also Leslie v. Attorney Gen.*, 611 F.3d 171, 175-76 (3d Cir. 2010). In *Accardi*, the Supreme Court reversed the dismissal of a habeas petition in which the petitioner alleged that the BIA had failed to follow its own regulations. *See* 347 U.S. at 266-68. "[E]mphasiz[ing] that [it was] not ... reviewing and reversing the manner in which discretion was exercised," the Court held that the petitioner was entitled to a hearing on "the Board's alleged failure to exercise its own discretion, contrary to existing valid regulations." *Id.* at 268. *See also Augustin v. Sava*, 735 F.2d 32, 38 (2d Cir. 1984) (holding that an asylum applicant was entitled to "procedural rights protected by statute and INS regulations").

Congress established a clear statutory framework in 8 U.S.C. §§ 1229 and 1229a to ensure that individuals facing removal are afforded notice and the opportunity for a full hearing before an IJ. These provisions safeguard not only the integrity of the asylum process, but also the constitutional guarantees of due process. *See Trump*, 145 S. Ct. at 1006, *citing Reno*, 507 U.S. at 305. Section 1229a sets forth the procedures for removal proceedings, including the right to present evidence, cross-examine witnesses, and apply for relief such as asylum. Cardin Alvarez was denied these congressionally-mandated protections when his pending § 240 proceedings and his applications for asylum and to adjust status were abruptly and without any explanation terminated. Being placed in expedited removal proceedings truncated his right to a full hearing before an IJ and to an appeal to the BIA, and terminated his pending applications for withholding of removal, i.e., his application for asylum and for adjustment of status, without the substantive consideration required by federal law and regulations. In effect, the use of expedited removal nullified the statutory framework Congress designed to protect those in precisely the same situation as Cardin Alvarez. To permit expedited removal in this situation would not only disregard Congress's clear statutory mandate but also endorse a process that silences and extinguishes meritorious asylum claims without the basic safeguards of notice, hearing, and judicial review. Full proceedings are the only means by which Cardin

Alvarez can meaningfully exercise his statutory right to seek asylum and present evidence of the grave risk he faces upon return to Cuba, including persecution, arbitrary detention, and torture.[17] And Cardin Alvarez never even received what minimal process expedited removal provides, namely a "credible fear" screening to identify his potential eligibility for asylum, which would require returning him to § 240 removal proceedings. 8 U.S.C. § 1225(b)(1)(B)(ii).

The circumstances of this case require some level of constitutional due process before Cardin Alvarez can be removed from the United States. Cardin Alvarez and others similarly situated were invited to this country, if in no other fashion than by the passage of the Cuban Adjustment Act. Cardin Alvarez was inspected at the border, expressed a credible fear, and was conditionally paroled into the United States. He was told by the United States government, when it acknowledged receipt of his application for asylum, "*You may remain in the U.S. until your asylum application is decided*." (ECF No. 19-2 at 186) (emphasis added). The application was never "decided," instead it was "withdrawn" by the very authority that was tasked with considering it on the merits. Although the new administration may believe the prior due process protections afforded noncitizens were unworkable or undesirable, such a belief, outside of Congressional approval or recission of the present statutory scheme, does not eliminate the rights of those who have reasonably relied on the programs and protections instituted by Congress. *Cf.* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611-01, 2025 WL 894696, at 13618-20 (outlining the reliance interests of those present in the country seeking lawful status). *See also Mata Velasquez*, 2025 WL 1953796, at *13.[18] A "new administration can change the rules, but it cannot change them

---

[17] The United States Department of State currently designates Cuba as a state sponsor of terrorism, along with North Korea, Iran, and Syria. *See* United States Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism (last visited Oct. 6, 2025). This designation reflects the United States government's recognition of the Cuban regime's role in supporting terrorism.

[18] Cardin Alvarez arrived in the United States several months prior to when the CHNV program was initiated, but the sentiment remains applicable.

1    and make up new rules as it goes along when the new rules abridge constitutional rights."

2    *Id.* Although "[DHS] might want to enforce this country's immigration laws efficiently, it

3    cannot do that at the expense of fairness and due process." *Ceesay v. Kurzdorfer*, 781 F.

4    Supp. 3d 137, 144 (W.D.N.Y. May 2, 2025). "[W]hen an agency changes course, it must

5    be 'cognizant that longstanding policies may have engendered serious reliance interests

6    that must be taken into account,' and '[it] would be arbitrary and capricious to ignore

7    such matters.'" *Torres-Jurado v. Biden*, No. 19-cv-3595, 2023 WL 7130898, at *4

8    (S.D.N.Y. Oct. 29, 2023), *quoting Department of Homeland Sec. v. Regents of the Univ.

9    of Calif.*, 591 U.S. 1, 30 (2020). Cardin Alvarez's "engendered reliance interest, and his

10   compliance with everything that the Executive Branch asked of him, entitles him to more

11   than summary arrest and detention on the mere say-so of a [g]overnment official." *Mata

12   Velasquez*, 2025 WL 1953796, at *14 (internal quotations omitted).

13          Furthermore, Cardin Alvarez's procedural due process rights were violated

14   because under the governing law, and even the recent designation, he did not meet the

15   statutory and regulatory requirements for being subjected to an order of expedited

16   removal. Under 8 C.F.R. § 235.3(b)(2)(ii), expedited removal applies to noncitizens who

17   arrive in the United States without being admitted or paroled and who cannot establish

18   continuous physical presence in the United States for the two years immediately prior to

19   the determination of inadmissibility, i.e., for the two years prior to the issuance of the

20   subject finding of inadmissibility and order of expedited removal. There is no dispute that

21   Cardin was present in the United States from February of 2022 through May of 2025, a

22   period of more than three years, during which time he received both authorization to

23   work and a Social Security number. Even allowing that Cardin Alvarez's entry into the

24   United States was via release on recognizance, a form of conditional "parole," the record

25   in this matter establishes that he was physically present in the United States for the two

26   years prior to being subjected to an order of expedited removal. Although parole into the

27   United States does not constitute being "admitted" into the United States, it does affect

28   the applicability of expedited removal. Under 8 C.F.R. § 235.3(b)(6), a noncitizen who

establishes that they were lawfully paroled into the United States is not subject to expedited removal but is instead evaluated for potential grounds of deportability under 8 U.S.C.A. § 1227(a) or inadmissibility under 8 U.S.C.A. § 1182(a). If the noncitizen's parole has not been terminated and they have been physically present in the United States for more than two years, they must be placed in standard removal proceedings rather than expedited removal. The regulation explicitly states that noncitizens who meet the two-year continuous physical presence requirement are not subject to expedited removal but are instead detained for standard removal proceedings under 8 U.S.C. § 1229a. The expedited removal process does not apply to such individuals, and they are entitled to a hearing before an IJ to determine their removability and eligibility for relief. *See* 8 C.F.R. § 235.3(b)(4)(i). Accordingly, Cardin Alvarez could not be legally placed in expedited removal and his mandatory detention pursuant to the order of expedited removal violates his right to procedural due process of law.

In 2022, when he was first apprehended near the San Luis port of entry, detained, and then released, DHS chose to place Cardin Alvarez in § 240 proceedings instead of pursuing expedited removal. At that time the government vested Cardin Alvarez with the procedural due rights that Congress guaranteed noncitizens in § 240 proceedings and noncitizens paroled into the country. In 2022 and when applying for asylum and adjustment of status Cardin Alvarez was vested with Constitutional and procedural rights which have since been violated. *See Augustin v. Sava*, 735 F.2d 32, 36 (2d Cir. 1984) (finding an asylum applicant was denied procedural rights protected by statute and regulations when, *inter alia*, a credible fear claim was not reviewed in the applicant's removal proceedings). *Cf. Torres-Jurado*, 2023 WL 7130898, at *3 ("Although [d]efendants were under no obligation to grant the ICE Stay in the first place, their decision to do so triggered obligations that they cannot now ignore.").

Moreover, the process due Cardin Alvarez by federal statutes and regulations entitled him to a substantive decision on his application for asylum and his application to adjust status under the CAA. Cardin Alvarez was denied due process when the IJ sua

sponte and without any form of consideration of the merits of those applications and without affording Cardin Alvarez a meaningful opportunity to challenge the denial of that relief, simply "withdrew" the applications when placing Cardin Alvarez into expedited removal proceedings. "ICE cannot manipulate the removal proceedings in its favor by substituting expedited proceedings for immigration proceedings already in progress before the immigration court. It is an abuse of process." *Valdez v. Joyce*, No. 25-cv-4627, 2025 WL 1707737, at *4 (S.D.N.Y. June 18, 2025). Furthermore, both federal statutes and regulations afford a noncitizen whose application for asylum as a form of withholding of removal has been denied the right to appeal that decision to the BIA and to a federal Circuit Court of Appeal, and the IJ's "withdrawing" of Cardin Alvarez's applications and placing him in removal proceedings denied him that right to appeal.

With regard to a reliance interest, which interest the Huffman Memorandum and the designation published in the Federal Register both averred should be respected with regard to placing a noncitizen in expedited removal proceedings, Cardin Alvarez was re-detained after being paroled in 2022, without a bond hearing, when he had been in full compliance with all of the conditions of his parole for three years and had been given permission to work and a Social Security number, and he appeared as required in his immigration court proceedings, and he filed colorable applications for asylum and adjustment of status, and he had never had any contact with law enforcement of any kind prior to being placed under arrest when he appeared, as ordered, at his routine, periodic, § 240 hearing. Cardin Alvarez was vested with a reasonable reliance interest in being allowed to legitimately seek asylum and/or adjustment of status, including the adjustment of status available to Cuban nationals pursuant to the CAA, and an adjudication of the merits of those applications, including any appeal of the denial of those applications to the BIA. Accordingly, he had a vested reliance interest, which was affirmed by the government from 2022 until his detention in May of 2025, in an adjudication on the merits of his application for asylum and application for adjustment of status.

1

**B.    Substantive Due Process**

2

Cardin Alvarez asserts his substantive due process rights are violated by his

3

continued detention. Cardin Alvarez argues the "risk of an erroneous deprivation of [his]

4

liberty under the current procedures is extraordinarily high. At the time DHS sought

5

dismissal of his § 240 removal proceedings, Mr. Cardin was actively pursuing claims for

6

asylum, withholding of removal, and protection under the CAT …" (ECF No. 1 at 8). He

7

further asserts: "Civil immigration detention violates due process if it is not reasonably

8

related to its statutory purpose. With respect to immigration confinement, the Supreme

9

Court has recognized two special justifications: (1) preventing flight and (2) preventing

10

danger to the community." (ECF No. 1 at 10) (internal citation omitted). Cardin Alvarez

11

argues:

12

> Preventing flight, which is meant to ensure compliance with court
> appearances, is not a legitimate concern in Mr. Cardin's case. He has never

13

> demonstrated any indication of being a flight risk, as shown by his
> consistent compliance with all reporting requirements and court

14

> appearances throughout the duration of his § 240 removal proceedings. In
> fact, Mr. Cardin was detained by ICE while he was attending his scheduled

15

> immigration court hearing, further demonstrating his full compliance and

16

> intent to follow the legal process. Mr. Cardin was actively pursuing legal
> avenues to regularize his immigration status when Respondents abruptly

17

> terminated his removal proceedings, disrupting a lawful process in which

18

> he was fully engaged. Under these circumstances, continued detention
> cannot be justified on the basis of flight prevention.

19

20

(ECF No. 1 at 10). Cardin Alvarez emphasizes that he has had no contacts with law

21

enforcement since his entry into the United States, and contends his detention appears to

22

be purely punitive as it bears no "reasonable relation" to any legitimate government

23

purpose, and is therefore in violation of his right to substantive due process. (*Id.*, *citing*

24

*Zadvydas*, 533 U.S. at 690 (holding immigration detention is civil and thus assumed to be

25

"nonpunitive in purpose and effect")).[19]

26

27

28

---

[19] Count Three of the petition, seeking an order requiring Cardin's release on bond during
the pendency of his habeas proceedings, was dismissed by the Court on August 22, 2025.

Cardin Alvarez unquestionably has a substantive due process right to his liberty, which may not be abridged absent adequate procedural protections. "[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality." *Martinez*, 2025 WL 2084238, at *8. "In the latter instance" the federal courts have "recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Id.*, *quoting Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). For someone like Cardin Alvarez, who was present in the United States on recognizance, i.e., with the government's knowledge and permission, for years "after [his] initial encounter" at the border, "it cannot be denied that [he] was already in the country." *Id.* (internal quotations omitted).

ICE has the authority to re-arrest a noncitizen previously detained and allowed into the United States, and detain them pending the outcome of further removal proceedings, only when there has been a change in circumstances since the individual's initial release. *See* 8 U.S.C. § 1226(b); 8 C.F.R. § 236.1(c)(9). *See also Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021) ("Thus, absent changed circumstances ... ICE cannot redetain Panosyan."); *Matter of Sugay*, 17 I&N Dec. 647, 640 (B.I.A. 1981). Additionally, any change in circumstances must be "material." *Saravia v. Barr*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). The government's authority to arrest a noncitizen and revoke their release is also proscribed by the Due Process Clause because it is well-established that individuals released from detention have a liberty interest in their freedom. To protect that interest, due process requires notice and a hearing, prior to any re-detention, at which hearing the individual is afforded the opportunity to advance their arguments as to why their release should not be revoked. This most basic of core American principles—that individuals placed at liberty are entitled to process before the government redetains them—has particular meaning here, where Cardin Alvarez's detention was found, in 2022 and at all times since, to be unnecessary.

Although ICE has the initial discretion to detain a noncitizen pending removal proceedings, after that individual is released from custody they have a protected liberty interest in remaining out of custody. *See Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.");[20] *Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021). Cardin Alvarez's re-detention, after three years of being released on recognizance after an initial detention on inspection, was without prior notice, a showing of changed circumstances, or a meaningful opportunity to object, and therefore he was not afforded the procedural requirements of the Fifth Amendment. *See, e.g., Rosales-Garcia v. Holland*, 322 F.3d 386, 409 (6th Cir. 2003) ("Excludable aliens—like all aliens—are clearly protected by the Due Process Clauses of the Fifth and Fourteenth Amendments."), *citing Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

The Court should interpret the Due Process Clause protections afforded a noncitizen consistent with the longstanding precedent recognizing these protections must be balanced with the government's countervailing interests in immigration enforcement. To determine whether civil detention violates a detainee's right to liberty the federal courts apply the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022); *Hernandez v. Sessions*, 872 F.3d at 993; *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021). *Mathews* requires consideration of (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures

---

[20] The government voluntarily dismissed its appeal of the Norther District of California's decision in *Ortega* to the Ninth Circuit Court of Appeals. *See Ortega v. Bonnar*, No. 20-15754, 2021 WL 1590193 (9th Cir. Jan. 15, 2021).

used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

The private interest affected by the official action in this matter is the most sacred and profound right afforded by the United States Constitution, i.e., the right to liberty, to one's personal freedom, to be free from being placed in a de facto prison without having committed any crime or otherwise violated or abused any agreement with, or privilege afforded by, the United States of America. Additionally, the conditions of Cardin Alvarez's detention further tip this first factor in his favor. When assessing this factor, courts consider the conditions under which detainees are currently held, including whether a detainee is held in conditions indistinguishable from criminal incarceration. *See Hernandez-Lara*, 10 F.4th at 28 (involving a noncitizen detainee held "alongside criminal inmates" at a county jail); *Velasco Lopez*, 978 F.3d at 852 (observing a noncitizen was "not detained" but, rather, was incarcerated in conditions identical to those imposed on criminal defendants). *Cf. Gunaydin v. Trump*, 784 F. Supp. 3d 1175, 1187 (D. Minn. May 21, 2025) (noting the petitioner, housed in a county jail facility along with other civil detainees in addition to criminal suspects and convicted criminals, was "experiencing all the deprivations of incarceration, including loss of contact with friends and family, loss of income earning, interruptions to his education, lack of privacy, and, most fundamentally, the lack of freedom of movement."). Cardin Alvarez is detained at the San Luis Regional Detention Center, just about as far across the United States as he can be from his father, his friends, and his attorney. The detention center is owned by the city of San Luis, Arizona, and operated by LaSalle Corrections, a private company. It is a medium-security facility which houses immigration detainees awaiting trial and deportation, and immigrants serving sentences following a criminal conviction.[21]

---

[21] The only visitation allowed at the San Luis Detention Center is no-contact visitation, and this visitation is limited to one day per week. Visits with clergy must be scheduled in advance. No electronic devices are allowed and all visitors are searched. "A detainee may

With regard to the risk of an erroneous deprivation of Cardin Alvarez's liberty interest, the process Cardin Alvarez was afforded regarding his detention pursuant to an order of expedited removal was not a hearing on the merits of his removal or withholding of removal, i.e., his application for asylum and his application for adjustment of status, nor was Cardin Alvarez provided a hearing on the necessity of his detention or a release on bond. Cardin Alvarez was not afforded any hearing, or procedural safeguards, that balanced his protected liberty interest with the government's interest in immigration enforcement. The Ninth Circuit has held that when there is a substantial liberty interest at stake, the government should have the burden of proving, by clear and convincing evidence, that an individual is a danger or flight risk before depriving the individual of their liberty. *See Singh*, 638 F.3d at 1203-04. Had Cardin Alvarez been given his due process with regard to either or both his application for asylum or for adjustment of status pursuant to the CAA, it is likely he could have established a basis for withholding of removal. Because Cardin Alvarez was placed in expedited removal, he has no right to an appeal of the detention officer's order of removal by an IJ, the BIA, or the Ninth Circuit Court of Appeals. At this time, it is unlikely that any additional procedural measures conducted by the same agency would protect Cardin Alvarez's interests, because being placed in expedited removal proceedings requires that Cardin Alvarez be detained and removed without any opportunity to appeal to the BIA or the Ninth Circuit Court of Appeals.

*Matthews* also requires consideration of the government's interest, including the function involved and "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews*, 424 U.S. at 335. Civil detention comports with due process only when a "special justification" outweighs the

---

receive items that are determined to be of necessity for the sole purpose of travel or release from agency custody with approval of the ICE Deportation Officer." https://www.ice.gov/detain/detention-facilities/san-luis-regional-detention-center (last visited Oct. 6, 2025). Detainees are not allowed to receive incoming calls. Contact with legal counsel is limited and must be scheduled in advance. Legal mail is "inspected for contraband but not read." *Id.*.

"individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690. Respondents have not identified any new information specific to Cardin Alvarez's circumstances to undermine its own prior determinations (in 2022, and in any subsequent periodic appearances in his § 240 proceedings or during the pendency of his asylum or adjustment of status proceedings, or when considering his request for work authorization) that he did not pose a danger or a flight risk if allowed to remain at large in the population during his removal proceedings.. *See Saravia*, 280 F. Supp. 3d at 1176 ("Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk."); *Valdez*, 2025 WL 1707737 at *3 & n.6 ("[T]he present allegation by ICE that Petitioner is at risk of flight is directly at odds with the contrary Department of Homeland Security ("DHS") decision to release Petitioner on his own recognizance…"). Respondents' only apparent interest in keeping Cardin Alvarez in custody, which actually places an additional fiscal and administrative burden on the government, is to fulfill a quota of arrests, i.e., 3,000 immigration arrests per day, set by the current administration.

Additionally, because immigration detention is civil, it can have no punitive purpose. The government's only legitimate interests in holding an individual in immigration detention, at the expense of the federal taxpayer, can be to prevent danger to the community or to ensure a noncitizen's appearance at an immigration, i.e., removal proceeding. *See Zadvydas*, 6 533 U.S. at 690. With regard to Cardin Alvarez, it is simply not plausible that Respondents have any legitimate or compelling basis for detaining Cardin Alvarez, who entered the United States in early 2022 on recognizance and after inspection, and continued to be released after appearing before an immigration court in 2023, and has been deemed worthy of a Social Security number and work permission, and who has filed an application to adjust status under the CAA and and has been in asylum proceedings after being found to have a credible fear of being returned to Cuba when he entered the United States in 2022. Moreover, Cardin Alvarez has lived at liberty,

and worked, in Florida, without any criminal or civil infractions, and he has earned the respect and support of United States citizens. (ECF No. 19-1 at 67-74).

The public interest also weighs in Cardin Alvarez's favor. "The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025), *citing Jorge M.F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021). *See also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights.").

Therefore, all of the factors stated in *Matthews* weigh in favor of declaratory judgment finding Cardin Alvarez's due process rights have been violated, and an order requiring his release.

## VI. Conclusion

The United States Constitution's protections apply to all "persons" within the United States, including noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent. "[H]ow can we pride ourselves on being a nation of laws if we are not willing to extend that most fundamental right to all—if we are not at least willing to ask, before we lock you up, do you have anything to say?" *Ceesay*, 2025 WL 1284720, at *20. It is well-established that the Due Process Clause imposes a significant constraint on the manner in which the executive branch agencies may exercise their authority, "through detention or otherwise." *Hernandez*, 872 F.3d at 990 n.17, *citing Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972, *and Zadvydas*, 533 U.S. at 695.

In light of the deprivation of Cardin Alvarez's liberty, formerly granted and approved by Respondents, and the absence of any deliberative process prior to, or contemporaneous with, the deprivation of his liberty, and the statutory and the Constitutional rights which have been violated by his current detention, a writ of habeas corpus is the only vehicle for relief. It is, in essence, the most appropriate remedy.

With regard to the specifics of the relief that might be ordered, in recent weeks many federal district courts have ordered the immediate release of immigration habeas petitioners held in custody in violation of their due process rights. *See, e.g.*, *Santiago v. Noem*, No. 25-cv-361, 2025 WL 2792588, at *13 (W.D. Tex. Oct. 1, 2025); *J.U. v. Maldonado*, No. 25-cv-4836, 2025 WL 2772765, at *10 (E.D.N.Y. Sept. 29, 2025); *Zumba v. Bondi*, No. 25-cv-14626, 2025 WL 2753496, at *11 (D.N.J. Sept. 26, 2025); *Sampiao v. Hyde*, No. 25-cv-11981, 2025 WL 2607924, at *12 (D. Mass. Sept. 9, 2025); *Rosado v. Figueroa*, 2025 WL 2337099, at *19 (D. Ariz. Aug. 11, 2025); *M.S.L. v. Bostock* , 2025 WL 2430267, at *1(D. Or. Aug. 21, 2025). The appropriate relief for an immigration detainee held in violation of their right to due process is their immediate release from custody, and to be provided with relief returning them to status quo ante, i.e., the last uncontested status which preceded the pending controversy.

Accordingly,

**IT IS RECOMMENDED that** the Court declare Cardin Alvarez's detention pursuant to an order of expedited removal which does not comport with United States law, is in violation of Cardin Alvarez's United States Constitutional right to procedural and substantive due process and, accordingly,

**IT IS FURTHER RECOMMENDED that** the petition for habeas relief pursuant to § 2241 be **granted forthwith**.

**IT IS FURTHER RECOMMENDED that** the Court order Cardin Alvarez's immediate release from detention.

**IT IS FURTHER RECOMMENDED that** the Court order Respondents to **vacate** the order of expedited removal and return Cardin Alvarez to removal proceedings pursuant to § 240 and order Respondents to re-open proceedings on the merits of Cardin Alvarez's application for asylum and his application for adjustment of status pursuant to the Cuban Adjustment Act.

Because § 1225(b) governs detention during expedited removal proceedings and requires mandatory detention and § 1226 governs detention during § 240 proceedings,

and does not require mandatory detention, it is dispositive to the relief requested by Cardin Alvarez to determine under which statute he may rightfully be detained. The federal courts have uniformly held that § 1225(b) does not apply to noncitizens, such as Cardin Alvarez, who are present within the United States with the government's permission and have been residing in the interior of the United States for several years. Nearly all of the federal district courts that have considered this question have, upon conducting well-reasoned analyses of the relevant statutes, regulations, legislative history, and governing published and unpublished legal opinions, concluded that noncitizens inspected at the border and then allowed into the United States under parole on recognizance may not be detained absent a bond hearing pursuant to § 1226, and that they are not subject to mandatory detention under § 1225. *See*, *e.g.*, *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1256 (W.D. Wash. 2025); *Salcedo Aceros v. Kaiser*, No. 25-cv-06924, 2025 WL 2637503 (N.D. Cal. Sept. 12, 2025); *Sampiao v. Hyde*, No. 25-cv-11981, 2025 WL 2607924 (D. Mass. Sept. 9, 2025); *Martinez*, 2025 WL 2084238; *Francisco T. v. Bondi*, No. 25-cv-03219, 2025 WL 2629839 (D. Minn. Aug. 29, 2025); *Lopez-Campos v. Raycraft*, No. 25-cv-12486, 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025); *Diaz Diaz v. Mattivelo*, No. 25-cv-12226, 2025 WL 2457610 (D. Mass. Aug. 27, 2025); *Maldonado v. Olson*, No. 25-cv-3142, 2025 WL 2374411 (D. Minn. Aug. 15, 2025); *Lopez Benitez v. Francis*, No. 25-cv-5937, 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025); *Rosado*, 2025 WL 2337099; *Gomes v. Hyde*, No. 25-cv-11571, 2025 WL 1869299 (D. Mass. July 7, 2025); *Rodrigues De Oliveira*, No. 25-cv-0029, 2025 WL 1826118 (D. Me. July 2, 2025). The consensus among the United States District Courts is that the government should not be allowed to re-detain a noncitizen without a pre-deprivation bond hearing before a neutral arbiter pursuant to § 1226(a) and its implementing regulations, of which the noncitizen must be given seven days notice and at which hearing the government, rather than the noncitizen, shall bear the burden of justifying detention by clear and convincing evidence that detention is warranted, i.e., that the

1    noncitizen poses a flight risk or danger or is at risk of fleeing and at which hearing the

2    noncitizen's eligibility for bond must be considered. Accordingly,

3         **IT IS FURTHER RECOMMENDED that** the Court order that Respondents

4    shall not re-detain Cardin Alvarez absent a pre-deprivation hearing as described *supra*.

5         This recommendation is not an order that is immediately appealable to the Ninth

6    Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

7    Appellate Procedure, should not be filed until entry of the District Court's judgment.

8    **Ordinarily, pursuant to Rule 72(b), Federal Rules of Civil Procedure, the parties are**

9    **allowed fourteen (14) days from the date of service of a copy of this recommendation**

10   **within which to file specific written objections with the Court. However, given the**

11   **urgency of this matter,**

12        **IT IS ORDERED that any objections to this Report and Recommendation be**

13   **docketed within forty-eight (48) hours of the time this Report and Recommendation**

14   **is docketed.**

15        Pursuant to Rule 7.2(e)(3) of the Local Rules of Civil Procedure for the United

16   States District Court for the District of Arizona, objections to the Report and

17   Recommendation may not exceed ten (10) pages in length. Failure to timely file

18   objections to any factual or legal determinations of the Magistrate Judge will be

19   considered a waiver of a party's right to de novo appellate consideration of the issues. *See*

20   *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

21        Dated this 7th day of October, 2025.

22

23

24

25

26                              Camille D. Bibles

27                      United States Magistrate Judge

28